## Table of Contents

I.    INTRODUCTION ....................................................................................................................2

II.    FACTUAL BACKGROUND ....................................................................................................3

III.    STANDARD OF REVIEW ...................................................................................................10

    A.   **Motion to Dismiss** ......................................................................................................10

    B.   **Motion for Summary Judgment** ...............................................................................11

    C.   **Judicial Deference to Prison Authorities** ...............................................................12

III.    ARGUMENT ........................................................................................................................13

    A.   **Governmental Immunity Precludes Defendants' Liability** ....................................13

    B.   **DPSCS and ECI Cannot Be Liable Because They Are Not Persons Subject to §1983 Claims**............13

    C.  **Plaintiff Failed to Exhaust His Available Administrative Remedies.** ....................13

    D.  **Plaintiff's Complaint About his ARPs' Dismissals is Not Viable in this Lawsuit.**...............15

    E.  **Plaintiff Failed to State a Claim for Failure to Protect Him from Harm by Another Prisoner** ...........15

    F.  **Assignment to Segregation and Any Limitation on Recreation, Phone Use, and Commissary Purchases Did Not Violate Plaintiff's Constitutional Rights.**..........................20

    G.   **Jobs and Programs** ...................................................................................................24

    H. **Plaintiff Failed to State a Claim for Interference with His Religion.** .....................25

    I. **Plaintiff Failed to State a Claim for Denial of Access to the Courts.** ......................28

    J. **Allegations Related to Personal Property Do Not State a Constitutional Claim.** ...................29

    K.   **Visitation** ...................................................................................................................29

    L.   **Plaintiff's Increase from Minimum to Medium Security Classification and "Delay" in Reducing His Classification to Pre-Release Did Not Implicate a Protected Liberty Interest Because the Institution Was Rationally Pursuing a Legitimate Penological Interest**........................30

    M.   **There is No *Respondeat Superior* Liability in this Case.**.....................................31

    N.   **Qualified Immunity Precludes Liability** ................................................................32

IV.    **CONCLUSION** ...................................................................................................................34

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| RODNEY L. CHASE, JR., #449-168 | * | |
| Plaintiff, | * | |
| v. | * | Civil No.  SAG-20-2174 |
| DOC, et al. | * | |
| Defendants. | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**I.       INTRODUCTION**

Plaintiff's complaint centers on an alleged failure to protect him from an October 13, 2019, dayroom altercation. The altercation apparently resulted from a conversation about the phones, a conversation from which Plaintiff could have walked away to any other part of the two-level dayroom. Physical altercations from disputes about the phones are extremely rare. The fight at issue was sudden and unexpected, coming out of Plaintiff's literal left field. COII Marshall immediately called for back-up and ordered the inmates to stop fighting. From start to finish, it was over in under ten (10) seconds. Plaintiff's situation falls far short of the "failure to protect" threshold. Similarly failing to give rise to constitutional rights violations are Plaintiff's complaints about his housing assignments, the restrictions while in segregation (including for his safety), and changes in his security classification. These were to promote safety and security, including for Plaintiff. Of course, all of Plaintiff's claims fail because he failed to exhaust his available administrative remedies. For these and other reasons described herein, the Court should dismiss Plaintiff's complaint or grant summary judgment in Defendants' favor.

## II.    FACTUAL BACKGROUND

On June 28, 2019 Plaintiff transferred as a minimum-security inmate from Brockbridge Correctional Facility (BCF) to ECI Annex (ECI-A) due to a reported heated argument with BCF correctional staff**. Gragg Ex. 1 ¶** 3; **ECI Ex. 2** p. 4**.**

There, on July 25, 2019, after threatening an ECI-A correctional officer, Plaintiff was cited with an infraction (NOIRV) and transferred to ECI West (ECI-W). **Gragg Ex. 1**; *see also* **ECI Ex. 2** p. 14. The NOIRV recommended to increase Plaintiff's security level from minimum to medium. **Ex. 2** p. 14

At ECI-W, Plaintiff was assigned to administrative segregation (AdSeg) Pending Adjustment (AdSeg PA). **Ex. 2** p. 3. On July 31, 2019, he pled guilty to the NOIRV and was sanctioned with cell restriction. *Id*., p. 10.

On August 4, 2019, he was released to general population in ECI-W housing unit (HU) 2. **ECI Ex. 2** p. 3. On August 5, 2019, his security classification was formally increased to medium. **Gragg Ex. 1 ¶** 7.

There is no record of any expression by Plaintiff of concern about his safety at ECI before Oct. 13, 2019. **Barnes Dec., Ex. 3** (no such expression before or after Oct. 13, 2019); **Administrative Remedy Coordinator Declaration (ARC) Ex. 4 ¶** 3; **ECI Ex. 2** p. 18.

On October 13, 2019, Plaintiff was in the dayroom with approximately 60 other inmates, all of whom had mobility between the upper and lower dayroom floors. *See*, **Marshall Ex. 5 ¶** 4.

In the video's opening scene, we see Chase walking up, then back down, the stairs, and, as he gets to the bottom of the stairs, steps out of camera view. *See*, **Perry Ex 6 ¶** 7 (identifying Chase, Lyons, and Martin) & **Video** 14:42:49.[1] As this happens, Martin walks toward the showers, then, after Chase returned to the lower level and left the view, Martin walks and speaks in Chase's direction, until Martin, too, is out

---

[1] Arrangements for Plaintiff to view the Video included with Exhibit 6 will be made through MCTC, and Defendants will inform the Court when Plaintiff has seen the video.

of view. **Perry Ex 6** ¶ 7 & **Video** 14:42:50- :56.

Chase re-enters the view, turns, and speaks toward the area where Martin had walked out of view. **Video**, 14:42:58 -14:43:00.

Plaintiff's discussion was in the area of, and about, the phones. **Perry Ex 6** ¶ 7; **Marshall Ex. 5** ¶ 5; **ARC Ex. 4** p. 7; **Bundick Ex. 19** ¶ 3. Inmates often get into arguments near the phones, but these very rarely turn into physical altercations, and physical alterations are the very rare exception. **Perry Ex. 6** ¶ 8; **Marshall Ex. 5** ¶ 5.

Chase turns away from the phones and walks toward the center of the screen. **Video**, 14:43:01. Rather than continue to walk away, Chase turns back, shrugging his shoulders and talking to the person off screen, then, again, turns to walk away toward the center of the screen again, *id*., 14:43:02. Rather than continue walking away, Chase turns back to address the person off screen, then approaches and talks to an inmate near the stairs (Lyons). *Id*., 14:43:07 – 14:43:12. *See also* **Perry Ex. 6** ¶ 7; **Bundick Ex. 19** ¶ 3.

As Chase talks to Lyons, from Chase's left side, Martin lunges into view swinging at Chase, driving him backward to the center of the room. **Video**, 14:43:13; see also **IID Ex. 7**, p. 7.

Within the first second of the physical exchange, Lyons pulls something from his pants, follows them, makes stabbing motions at Chase's back, then retreats as Martin and Chase continue to fight. **Video**, 14:43:14 – 14:43:17; **Perry Ex. 6** ¶ 7; **IID Ex. 7**, p. 7.

Immediately on seeing the physical fight, COII Marshall, who had been stationed at the tier, radioed a 10-10 for back-up and shouted into the day room, "Stop fighting! Stop fighting!" **Marshall Dec., Ex. 5** ¶ 7; *see also,* **IID Ex. 7** p. 7; **Bundick Ex. 19** ¶ 5.

Marshall stood ready to deploy pepper spray if the inmates refused to de-escalate and stop fighting as he waited for back-up to respond to the 10-10 call; they stopped fighting and pepper spray was not needed. **Marshall Ex. 5** ¶¶ 8, 9; *see also* **Perry Ex. 6** ¶ 9 (goal to de-escalate), p. 11; **Bundick Ex. 19** ¶ 6.

Chase and Martin stopped fighting in just under 10 seconds of the initial blows. **Video**, 14:43:13 - 14:43:23.

As back-up positioned at the dayroom, Martin was at the showers, Lyons upstairs, and Chase alone in the center of the room, then Martin went upstairs. **Video**, 14:43:29 - 14:43:50; **Bundick Ex. 19** ¶ 7.

Correctional staff at the lower level tried to get Plaintiff to come to the door so that they could quickly extricate him without having to wait to secure the area and enter the dayroom, but he did not approach the door. **Bundick Ex. 19** ¶ 8.

To prevent ambush, riot, and other security risks, correctional officers cannot enter the dayroom until sufficient back-up arrive to secure the area. *See*, **Perry Ex. 6** ¶ 10; **Marshall Dec, Ex. 5** ¶ 8; **ECI Ex. 2** p. 19. Also, to prevent attacks from above, and not knowing the location of any inmates with weapons, it was important to secure the dayroom upper level before correctional staff could more safely enter the lower level. **Perry Ex. 6** ¶ 10; **Marshall Ex. 5** ¶ 8; **Bundick Ex. 19** ¶ 8.

Once the upper level was secure, Marshall entered the dayroom and glanced around for safety as he strode directly to Chase, **Video** 14:45:15 - :22; **Marshall Ex. 5** ¶ 12, 13.

Marshall immediately got Plaintiff to lower the cloth from his face and looked at Plaintiff's facial injuries. **Video** 14:45:22-23; **Marshall Ex. 5** ¶ 13. Rather than cuff Plaintiff behind the back, the standard method after an altercation, Marshall cuffed Plaintiff in the front so that Plaintiff could continue to apply pressure to his face if needed (using a shirt that another inmate had given him, **Video**, 14:43:59 – 14:44:14, before the officers entered). **Marshall Ex. 5** ¶ 13; **Video**, 14:45:25-32. Lt. Sturgis then walked Plaintiff out of the dayroom to the medical department. **Marshall Ex. 5** ¶ 14; **Video**, 14:45:32 – end; **Perry Ex. 6** p. 11.

*Medical attention*

Plaintiff received prompt medical attention from medical staff. **IID Ex. 7** p. 41 (vital signs taken by

2:58). At 3 p.m. the medical department called for emergency transport to take Plaintiff to a local hospital for emergency treatment. ***Id***. p. 42. Emergency transport responded at 3:07, ***id***., and left ECI at 3:14, ***id***., taking Plaintiff to a local hospital where he was examined, treated, and released, ***id.*** pp. 49 – 60. Plaintiff returned to ECI's medical department for skilled care until his health care providers released him to segregation on Oct. 14, 2019. ***Id.*** pp. 43-48; **Meds Ex. 8**, p. 2 -3.

*Reports, NOIRV, & Segregation Housing*

On October 13, 2019, as HU Lieutenant, Defendant Pepper was responsible to gather information for the Serious Incident Report (SIR). **Pepper Ex. 9**. When he reported to the dayroom, the fight was over. ***Id***. ¶ 3. He received two weapons and typed the Chain of Custody form. ***Id***. ¶ 4 & p. 3. Capt. Pepper notified the DPSCS Intelligence and Investigations Division (IID) of the incident and documented that notice. ***Id***. ¶ 5 & p. 4. Capt. Pepper was not involved in handling inmate Chase's personal property, directing where Plaintiff was housed or whether he should be assigned to segregation, the processing of Plaintiff's ARPs, or his medical treatment. ***Id***. ¶ 6.

On October 13, 2019, then-Capt. Perry was ECI's senior day shift. **Perry Ex 6** ¶ 1. When the ECI-W supervising Lieutenant told her that a 911 emergency transport was arranged for one of the 10-10 inmates, she began preparing the SIR. ***Id.*** ¶ 4. Perry had no control over housing assignments for Chase, Martin, or Lyons or in deciding on what, if any, disciplinary sanctions would issue against them. ***Id.*** ¶ 12. Defendant Perry was not involved in the handling of Plaintiff's personal property, responding directly to the dayroom fight, directing where Plaintiff was housed or whether he should be assigned to segregation, processing Plaintiff's ARPs, or his medical treatment. ***Id.*** ¶ 15.

It is standard procedure that every inmate involved in a fight receives an infraction and is assigned to AdSeg PA, which is not the same as disciplinary segregation (DSeg). *See* **Perry Ex. 6** ¶¶ 11, 12. After reviewing the video of the incident, the Matters of Records that had been gathered and provided for the

SIR, photographs of the inmates involved, and the weapons, Capt. Perry prepared a NOIRV for each of the three inmates involved: Martin, Lyons, and Chase. *Id.* ¶ 11.

After the altercation, Plaintiff was assigned to AdSeg PA. **Gragg Ex 1** ¶ 9; **ECI Ex. 2** p. 3.

On Oct. 18, 2019, for security reasons, Plaintiff's parents were denied entry to visit. **ECI Ex**. **2** pp. 113-115.

On Oct. 25, 2019, in a meeting of the intelligence division (Intel), a case management rep, and Plaintiff, Intel reported that, due to concern that Plaintiff had problems with members of the Bloods security threat group (STG), (Lyons was a verified member, **IID Ex. 7** p. 34), Intel was issuing a standing order to segregate and keep Plaintiff away from verified members of the Bloods STG, for Plaintiff's safety pending transfer from ECI. **Gragg Ex. 1** ¶ 11.

On November 6, 2019, ECI decided not to pursue disciplinary charges against Plaintiff for the dayroom fight. **ECI Ex. 2** p. 27. On December 2, 2019, he was moved to HU5, and, aside from a brief return to HU4, remained in HU5 until his October 2020 transfer to DRCF, *id*. pp. 2-3.

*Pre-release status and transfer*

While at ECI on AdSeg pending transfer, Plaintiff was reclassified to pre-release status in May 2020. **Gragg Ex. 1** ¶ 13. It took until October 16, 2020 for a bed to be available so that Plaintiff could be transferred, in part because of COVID-19 restrictions to prevent the spread of the coronavirus for public safety reasons, inmate movement was restricted. *Id*.

*Segregation housing requirements*

When assigned to AdSeg PA in HU4, Plaintiff was considered within the Administrative Segregation class, and, for purposes of restrictions, he was a Level II inmate, **ECI Ex. 2** p. 38 § O.2: "Inmates assigned to Administrative Segregation shall be treated according to the provisions of Segregation Level II."

Apart from allowing more postage stamps to Level I inmates (disciplinary segregation inmates, **ECI**

Ex. 2 p. 38 § O.1; p. 43), Level I and Level II inmates (those in AdSeg variations) had the same restrictions. They were not permitted phone privileges absent exceptional circumstances or specific approvals, *Id.* p. 40 § U.1; had limited commissary privileges, being permitted only to ordering from the Segregation Commissary List, *id.* p. 36 § H.1; p. 51; were prohibited from ordering food (*id.* p. 36 § H.3; p. 41 § V.1.c); and, while permitted indoor recreation, they were not eligible for outside recreation, which was restricted to Level III inmates, *id.* p. 47 § DD. Outside recreation is not guaranteed to any inmate. *Id.* p. 47 § DD; **Gragg Ex. 1** ¶ 14.

*Religious practice*

Inmates are informed they "are permitted to practice the approved religion of [their] choice as long as institutional security is not affected." **ECI Ex. 2** p. 59 (citing OPS 140.0002).

By completing a Religious Preference Registration Form, an inmate my identify as a member of a particular faith. **Chaplain Ex**. **10**. As of May 6, 2019, Plaintiff selected Islam/Sunni as his religious preference. *See* **BCF Ex. 11** p. 2.

Before the COVID-19 emergency, ECI-W segregation units could worship on Fridays. **Chaplain Ex**. **10** ¶ 8.

As of March 19, 2020, because of the COVID-19 emergency, all congregate worship was suspended for State correctional facilities. **Chaplain Ex. 10** ¶ 4. To avoid contagious diseases, Sunni religious principles *require* practitioners to avoid congregating: "An ill person should not mix with healthy people." [Muslim #2221b] *Id*. ¶ 5 The Prophet also said, "Avoid a [contagious] disease the way a person flees from a lion." [Bukhārī #5707]. *Id*. ¶ 5.

All inmates were able to continue to pray individually in their cells. **Chaplain Ex 10** ¶ 4. Also, during the COVID-19 emergency, inmates were and are able to access religious services by CCTV broadcast. *Id*. ¶ 7. The Sunni community services were scheduled to be presented each Friday at 5pm. *Id*.

For Sunnis, prayer rug use is a preferred, not mandatory, practice. **Chaplain Ex. 10** ¶ 6. Plaintiff said he lost his prayer rug, **ARC Ex. 4** pp. 14, 16, 22, but had one by the time of his transfer to DRCF, **DRCF Ex. 12**, p. 2 (inventory).

> *Plaintiff did not file any ARPs complaining of a failure to protect him, and did not appeal any ARP decisions*

From July 25, 2019, through his October 2020 transfer to DRCF, while at ECI, Plaintiff filed 7 ARPs (and resubmitted one). **ARC Ex. 4**, pp. 3-29.

Plaintiff did not file an ARP complaining that anyone failed to protect him from the October 13, 2019, altercation. **ARC Ex. 4** ¶ 4 & pp. 3-4, 7-8.

Plaintiff filed the following ARPs, which Defendant Jarman, as ARC, procedurally dismissed:

- ARP 1594-19 (10-21-2019) was the only ARP Plaintiff filed within 30 days of the October 13, 2019, incident. **ARC Ex. 4** pp. 3-4, 7-8.  In this ARP, he complains that, as of October 17, 2019, he had been placed in disciplinary segregation, did not receive medical attention from the medical department, and had his clothes taken without a confiscation form. *Id.* pp. 7-8. It was dismissed for procedural reasons requiring additional information by November 5, 2019, citing 12.02.28.11.A(1)(b). *Id.*
- ARP 1749-19 (11-14-2019) complained that he had been assigned to and still was on disciplinary segregation housing even though, he says, he was told he was approved for administrative segregation, but that an AdSeg bed was still not available, demanding AdSeg privileges of phone and commissary, and for information about clothes taken from him after the Oct. 2019 assault; and was dismissed for failure to submit within the established timeframe, citing COMAR 12.02.28.09.B. *Id.* pp. 9-10.
- ARP 1776-19 (11-19-2019) complained that he was still housed in the disciplinary segregation area although having been approved for administrative segregation, demand for privileges such as telephone and commissary access, and demand for information about his missing property; it was dismissed with request for additional information citing COMAR 12.02.28.11.A(1)(b) and instruction to rewrite the ARP, noting "multiple issues." *Id.* pp. 11-12.
- ARP 1853-19 (12-09-2019) complained about missing and broken items, the lack of opportunity to review his property before he was moved to HU4, and a failure to provide him with a commissary food order while he was in segregation; it was dismissed for multiplicity of issues with an instruction to "separate all" and, citing COMAR 12.02.28.11.A(1)(b), a request to itemize and provide proof of ownership of property missing or broken and date and identify the unit where the property was packed *Id.* pp. 13-14.
- ARP 1853-19 (12-16-2019) complained about missing and broken items and denial of opportunity to see his non-allowable property after he was placed in HU4; it was dismissed for failure to resubmit in accordance with prior instructions, citing COMAR 12.02.28.11.A(2)(c)(1). *Id.* pp. 15-20.

- ARP 1898-19 (12-18-2019) complained about "missing and broken items" and was dismissed as repetitive to ARP 1853-19, citing COMAR 12.02.28.11.B(1). *Id.* pp. 21-25.
- ARP 1916-19 (12-19-2019) complained about lack of segregation review by a case manager or by intel and by correctional officers, who, he said, did not take him out for a review, and dispute of a report that he did not refuse a review on Dec. 10. *Id.* pp. 26-27. Because the ARP involved complaints against three different departments, the ARP would have to be rewritten as three different ARPs to allow for direction of three different investigations, therefore, it was dismissed with notation of "rewrite ARP; multiple issues." Plaintiff did not submit rewritten ARPs. *Id.* ¶ 5 & pp. 9-10.
- 626-20 (7-16-2020) complained that a correctional officer denied him rec time on one day, July 14, 2020, and that a nurse and correctional staff "ignored" his complaints of chest pains. *Id.* pp. 28-29. It was procedurally dismissed with instructions to rewrite ARP: multiple issues, separate complaints, citing COMAR 12.02.28.11.A(1)(b). *Id.* p. 28.

Defendant Jarman believed in good faith that his dismissals and requests for additional information or resubmission were proper under governing regulations. *Id.* ¶ 6.

An inmate may appeal a procedurally dismissed ARP. COMAR 12.02.28.11.A and -D. Plaintiff represents that he wrote a letter to headquarters (HQ) about two of his ECI ARPs. *See* ECF 1-2, pp. 4-22 (ECI ARPs 1853-19 and 1858-19, and an ARP from BCF that is unrelated to ECI). The HQ response that Plaintiff submitted, ECF 1-2, p. 4, shows that HQ instructed that Plaintiff would have to file additional paperwork to effectively appeal those ARPs. ECF 1-2, p. 4. Plaintiff did not file additional paperwork to lodge an appeal. **HQ Ex. 13**. Plaintiff did not file appeals of any of his ARPs, *id.*, nor did he file any grievance with the Inmate Grievance Office (IGO). **IGO Ex. 14.**

## III.   STANDARD OF REVIEW

### A. Motion to Dismiss

Assessing a Rule 12(b)(6) motion, the court accepts a complaint's well-pled allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006); *Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997). However, the plaintiff must make allegations that "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court need not accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), or conclusory factual allegations devoid of any reference to actual events,

*United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). The Court should grant a motion to dismiss when the plaintiff failed to plead facts that plausibly suggest he is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

As *Twombly* expounded, and *Iqbal* confirmed, the sufficiency standard for federal pleadings "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint must pass a plausibility test that requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. Rule 8 "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it." *Twombly,* 550 U.S. at 555 n.3 (quoting 5 Wright & Miller, Federal Practice and Procedure § 1202, at 94-95 (3rd ed. 2004)). "[E]ven a pro se plaintiff has the burden of alleging sufficient facts upon which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996); *Allison v. Utah Cnty. Corp.*, 223 F.R.D. 638, 639 (D. Utah 2004).

**B. <u>Motion for Summary Judgment</u>**

The court may grant a motion for summary judgment if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A plaintiff who bears the burden of proof must factually support each element of the claim: "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A nonmoving party with the burden of proof must confront the motion for summary judgment with an affidavit or similar evidence, *Anderson,* 477 U.S. at 256, and "designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex Corp.*, 477 U.S. at 324, and must present "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). A "mere scintilla of evidence" does not create a fact issue. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958-59 (4th Cir. 1984).

Although the court ordinarily may not determine credibility between the parties, *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (reversing and stating that Court of Appeals should not have relied on plaintiff's "visible fiction" in resolving summary judgment motion)); *see also*, *Ricci v. DeStefano*, 557 U.S. 557 (2009). The Court also may reject testimony as incredible, as a matter of law, if it contains assertions that are contrary to the laws of nature. *See United States v. Zizzo*, 120 F.3d 1338, 1359 (7th Cir. 1997), *cert. denied*, 522 U.S. 998 (1997); *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1123 (5th Cir. 1997), *cert. denied*, 522 U.S. 819 (1997). "It is well established that a plaintiff's self-serving affidavit is not sufficient to withstand summary judgment." *See, e.g., Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000).

C. **Judicial Deference to Prison Authorities**

Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

> In the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order and to fashion responses to those threats. Hence, the "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). When a state correctional institution is involved, the deference of a federal court is even more appropriate. *Turner*, 482 U.S. at 85.

*In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, (aka, Mickle v. Moore)*

174 F.3d 464, 469 (4ᵗʰ Cir. 1999) (hereafter, *Mickle*).

   Inmate classification and classification-related housing decisions falls within the expertise of correctional officials. *See, Wetzel v. Edwards,* 635 F.2d 283 (4ᵗʰ Cir. 1980).

   Based on these standards, Defendants are entitled to summary judgment.

### III.   ARGUMENT

### A.  Governmental Immunity Precludes Defendants' Liability

   Under the Eleventh Amendment, unless the state consents, the state, its agencies, and departments are immune from federal lawsuits. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This bar extends to claims against state employees in their official capacity: a suit against a state officer in his official capacity is tantamount to a suit against the state itself. *Brandon v. Holt,* 469 U.S. 464, 471-72 (1985). Although the State of Maryland waived its sovereign immunity for certain types of state court cases, *see* Md. Code Ann., State Gov't § 12-201(a) (2004 Repl. Vol.), it has not waived its immunity under the Eleventh Amendment to suit in federal court. To the extent that Plaintiff sues Defendants in their official capacity, "the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101-02 (citations omitted). Therefore, Defendants are immune from this suit for claims against them in their official capacity.

### B.  DPSCS and ECI Cannot Be Liable Because They Are Not Persons Subject to §1983 Claims

   The Court should dismiss Plaintiff's claims against DPSCS and ECI because, as state agencies and departments, they do not constitute a person within the meaning of 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989); *see Clark v. Md. Dep't of Public Safety and Corr. Serv.,* 316 F. App'x 279, 282 (4ᵗʰ Cir. 2009) (DPSCS is not amenable to suit under 42 U.S.C. § 1983).

### C.  Plaintiff Failed to Exhaust His Available Administrative Remedies.

   This Court should dispose of Plaintiff's claims in Defendants' favor because Plaintiff failed to exhaust his available administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

To sustain a claim, Plaintiff first must exhaust his available administrative remedies, as mandated by State law and Department of Public Safety & Correctional Services (DPSCS) regulations. *See* Md. Ann. Code, Corr. Serv. Art. §10-201 *et seq*. (1999); Md. Cts. & Jud. Proc. Code Ann., §5-1001, *et seq*. Federal law mandates such exhaustion before a prisoner may file an action under §1983. "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §1997e(a) (1996).  *Anderson v. XYZ Correctional Health Services*, 407 F.3d 674 (4th Cir. 2005).

The inmate must pursue these administrative remedies to the highest available level. *See, Woodford v. Ngo*, 126 S.Ct. 2738 (2006). "An inmate who begins the grievance process but does not complete it is barred from pursuing a §1983 claim…." *Wright v. Hollingworth*, 260 F.3d 357, 358 (5th Cir. 2001); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).  Maryland's grievance process generally consists of three levels. *Chase v. Peay*, 286 F. Supp. 2d 523, 529 (D. Md. 2003).

First, the inmate must file an administrative remedy request/complaint (ARP) with the Warden's office within 30 days of the later of the date on which the incident occurred or the date the inmate first gained knowledge of the incident or injury giving rise to the complaint. COMAR 12.02.28.02(D)(1); COMAR 12.02.28.09(B). If the ARP is denied or dismissed, the inmate has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.02.28.11.A, 12.02.28.11.D, and 12.02.28.14(B)(5). If the appeal is denied, the inmate has 30 days to file a grievance with the IGO. Md. Code Ann., Corr. Servs. §§ 10-206, 10-210; COMAR 12.02.28.18.

Plaintiff did not initiate, let alone exhaust, his administrative remedies on the issue of failure to protect him from the alleged assaults before filing suit. **ARC Ex. 4** ¶ 4 & pp. 3-4, 7-8.

Plaintiff demonstrated the ability to file timely ARPs, and, in the one ARP that he filed within 30 days of the dayroom fight, he complained of many things -- his assignment to segregation, that he did not receive medical attention he wanted from the medical department, that his clothes were taken without a confiscation form, and that he was not able to exercise privileges such as recreation; notably, he failed to take this opportunity to complain about a failure to protect him. *See* **ARC Ex. 4** pp. 3-4, 7-8.

Although he could have appealed the procedural dismissals, COMAR 12.02.28.11.A and -D, Plaintiff did not file an appeal to HQ (even after HQ gave him opportunity to submit formal paperwork, ECF 1-2, p. 4), or complain to the IGO. **HQ Ex. 13**; **IGO Ex. 14.**

The Court should dispose of Plaintiff's complaint in Defendants' favor for failure to exhaust available administrative remedies.

### D.  Plaintiff's Complaint About his ARPs' Dismissals is Not Viable in this Lawsuit.

To the extent that Plaintiff's complaint that Defendant Jarman dismissed his ARPs (ECF 4, p. 3) is intended to be construed as a claim about the ARP process, Plaintiff fails to state a claim. Plaintiff has no constitutional right to the establishment of an administrative remedy or other grievance process or to participate in one voluntarily established by the state. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994), *cert. denied*, 514 U.S. 1022 (1995). It follows that no constitutional right of Plaintiff is implicated by any alleged errors or defects in such a process, such as Plaintiff attributes to Defendant Jarman's ARP dismissals. Defendant Jarman dismissed the ARPs in good faith compliance with the governing regulations. **ARC Ex. 4** ¶ 5. Plaintiff had the ability to appeal those dismissals, COMAR 12.02.28.11.A and -.D, but chose not to. *See*, **HQ Ex. 13**; **IGO Ex. 14**.

### E.  Plaintiff Failed to State a Claim for Failure to Protect Him from Harm by Another Prisoner

Plaintiff has not stated grounds for failure to protect him from the under 10-second spontaneous fight, which he could have averted by continuing to walk away, and to which correctional staff responded immediately and reasonably to de-escalate.

Not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Plaintiff must present evidence that each Defendant had a "sufficiently culpable state of mind," "one of 'deliberate indifference' to inmate health or safety." *Farmer, supra* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 302-03 (1991)). He must prove that Defendants knew of and disregarded "an excessive risk to inmate health or safety; [that they] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . *must also draw the inference*." *Farmer,* 511 U.S. at 837 (emphasis added). "A prison official's duty under the Eighth Amendment is to ensure *reasonable* safety." *Id.* at 844 (internal quotation marks omitted, emphasis added). Mere negligence will not suffice. *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). The Fourth Circuit set out a two-fold cognitive requirement: "'[T]he prison official must have both subjectively recognized a risk of substantial harm and subjectively recognized that his actions were inappropriate in light of that risk.'" *Campbell v. Florian,* 972 F.3d 385, 395 (4th Cir. 2020) (citations and some quotation marks omitted).

The threshold for finding a prison official liable under the Eighth Amendment is "very high." *Campbell*, 972 F.3d at 395. Plaintiff must prove that Defendants knew by ratiocination that the conditions presenting the risk were "*sure or very likely* to cause serious illness and needless suffering," with "sufficiently *imminent* dangers." *Baze v. Rees*, 553 U.S. 35, 49–50, (2008) (quoting *Helling v. McKinney,* 509 U.S. 25, 33, 34–35(1993)) (emphasis added). The foreseen risk must be so great that it is "almost certain to materialize if nothing is done." *Wilson v. Ryker*, 451 Fed. Appx. 588, 589, 2011 WL 6145397 at *1 (7th Cir. 2011). [2]

*The cognitive requirement for deliberate indifference is the <u>mens</u> <u>rea</u> equivalent to criminal law recklessness. Campbell*, 972 F.3d at 395 (citing *Farmer*, 511 U.S. at 839-40); *see also, Haughie v. Wexford*

---

[2] This and other unreported cases are cited for their reasoning, not as precedent.

*Health Sources, Inc., et al.*, Case No. 1:18-cv-03963-ELH (D.Md. September 17, 2020); *Wilson v. Seiter*, 501 U.S. 294, 297, 299 (1991) (The requisite "state of mind is one of 'deliberate indifference' to inmate health or safety;" the prohibited conduct is "obduracy and wantonness, not inadvertence or error in good faith . . . .").[3] To be liable, a defendant with actual knowledge of an imminent assault must have a "reasonable opportunity to act and '*simply refuse to do so*.'" *Raynor v. Pugh*, 817 F3d 123, 128 (4th Cir. 2016) (emphasis added) (defendant allegedly told plaintiff's attacker he did not care if he attacked plaintiff, then, smiling, watched the assault, radio in hand but *did not call for assistance*); *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 771-72, 767–69 (4th Cir. 2003) (defendants saw other inmates break into plaintiff's holding area and assault plaintiff, *did not call for back-up*, and *did nothing else to intervene*).

*The official cannot be liable where he did not draw the inference.* "[C]ourts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known . . ." *Farmer*, 511 U.S. at 843 n.8. *Rich v. Bruce*, 129 F.3d 336, 340 (that defendant was "so stupid, so lazy, so inattentive, so tired, so burnt out*"* that plaintiff was harmed does not amount to a constitutional violation). There can be no Eighth Amendment cruel punishment absent affirmative cognition; cruelty is not the result of accident or oversight, but of cognitive thought. *Farmer.* 511 U.S. at 837-838. The notion of deliberate, by definition, requires discursive cognitive processing. *See, Brown v. N. Carolina Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010). There is no violation where defendant "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Rich*, 129 F.3d at 340(citing *Farmer,* 511 U.S. at 844). "Mistakenly believe[ing] that the situation was not particularly

---

[3] Thus, negligently failing to protect an inmate from an attack by another inmate does not state a claim under either the Eighth or Fourteenth Amendments. *See United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990), *cert. denied*, 498 U.S. 1122 (1991); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (negligent failure by a prison official to protect an inmate from attack by another inmate does not state a claim under either the Eighth or Fourteenth Amendments).

serious" does not establish the requisite "deprivation" of a protected interest. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

"Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844." (as quoted by this Court in *Johnson v. Morgan*, 2018 WL 5983382 at*5, Nov. 13, 2018, CCB-18-78) aff'd, 764 F. App'x 386 (4th Cir. 2019). That the efforts are not effective does not mean that they were not reasonable; The actions taken may be reasonable even if the harm was not averted. *Farmer*, 511 U.S. at 844.

It is axiomatic that an officer who is not at the scene of an assault that is spontaneous or is present, but the altercation lasts only a few seconds, does not have a reasonable opportunity to intervene and will not be liable for a failure to protect. *See*, *Milledge v. McNeil*, No. 3:14-CV-248-J-32MCR, 2020 WL 619084, at *3-4 (M.D. Fla. Feb. 10, 2020); *Millbrook v. U.S.*, 8 F.Supp.3d 601, 615-17 (M.D.Pa. 2014); *see also, Kamara v. P.G. Cnty Dept. of Corrections*, No. ELH-15-3952, 2017 WL 735549 (D.Md. Feb. 24, 2017). Further, "[i]n failure to protect cases, 'prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm.'" *Raynor*, 817 F3d at 128 (quoting *Prosser v Ross,* 70 F3d. 1005, 1008 (8th Cir 1995); *Arnold v. Jones*, 891 F.2d 1370, 1372 (8th Cir. 1989) ( "unarmed prison officials have no duty *as a matter of law* to physically intervene in a prison fight which may cause them serious injury or worsen the situation"); *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995) (failure to immediately intervene in physical attack by one prisoner, who was wielding a shank, upon another held not to amount to deliberate indifference in part because prison officials had called for back-up).

The Court should dismiss Plaintiff's claims. He alleged no facts from which to infer that anyone, including Defendants, knew of and intentionally disregarded an excessive and imminent risk of serious harm to his health or safety. He alleges merely that their efforts were not successful to stop the fight sooner

than within under ten (10) seconds. ECF 1.

    This is a far cry from the *Raynor* or *Odom* cases where defendants stood by (one smiling), watched the assaults, and did nothing to intervene, refusing even to call for back-up. First, the named Defendants were not at all present at the scene for the under 10-second fight, if at all. **Derr Ex. 15** (not at ECI); **Pepper Ex. 9**. Here, COII Marshall and Sgt. Bundick actually (and reasonably) believed that the verbal dispute near the phones would follow the usual trend and resolve without escalation. **Marshall Ex. 5** ¶ 5; **Bundick Ex. 19** ¶ 3; *see also*, **Perry Ex. 6** ¶ 8. Following dayroom operating procedure, immediately on seeing Martin and Plaintiff exchange blows, Marshall radioed a 10-10 and shouted repeatedly at the inmates to stop fighting to deescalate the fight as he stood ready to deploy pepper spray if they refused. **Marshall Ex. 5** ¶¶ 7-9; **ECI Ex. 2** p. 19; *see also* **Perry Ex. 6** ¶10. They stopped fighting. With the fight's lasting under a mere 10 seconds, in the time it took to radio the 10-10 call with location, and issue the stop fighting order, the inmates were separating, making that use of force unnecessary. **Marshall, Ex. 5** ¶ 9; **Video,** 14:43:13 – 14:43:23; *see also*, **Perry Ex. 6** ¶ 9; **Bundick Ex. 19** ¶ 6.

    As for Plaintiff's complaints that (1) he was housed near Bloods for a week in HU4 after the incident (ECF 1, p. 4), and (2) that ECI's decision to press criminal charges caused Martin and Lyons to believe that Plaintiff pressed charges, resulting in his being labeled a snitch and subjected to threats (a claim he has not substantiated either as to his assailants' beliefs or the specifics of any threats) (ECF 1, p. 5, 6), even if he could substantiate these factual conclusions, they do not support a failure to protect claim, in large part because he has not alleged any injury resulting from these conditions. *See*, *Brown v. N. Carolina Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (injury is a required element of a failure to protect claim). First, Plaintiff did not report any concern about threats either before or after Oct. 13, 2019, at ECI. **Barnes Ex. 3**. Moreover, Plaintiff was flagged to keep away from Bloods after that first week in HU4, and the decision to press charges was reasonable action to promote public safety and security by holding Martin

and Lyons accountable for their assault on Plaintiff. Nor, on that latter point, do the facts support any basis existed for any confusion about who pressed charges. The criminal summonses were served on Lyons and Martin show that it was Det. Sgt. Horace Pepper (not Plaintiff) who pressed charges through the Somerset County Court Commissioner's office. **IID Ex. 7** pp. 8, 84-93. Although Plaintiff submits a copy of summonses for his own appearance at the initial Dec. 2019 trials for Martin and Lyons, ECF 1-2, pp. 23-24, there is no indication that Martins or Lyons ever saw the summonses served on Plaintiff, knew that Plaintiff had been summoned, or that Plaintiff even ever appeared as a witness on the Dec. 20, 2019 trial dates (which were postponed) or on the reset date of January 24, 2020 (at which Martin entered a plea and the charges against Lyons were docketed as *nolle pros*, suggesting that it would have been known in advance that Plaintiff's attendance was not required for entry of the plea or he *nolle pros*). **ECI Ex. 2** pp. 2-3 (absence of notation that Plaintiff was moved for a court appearance on either date); *see also*, Maryland Case Judiciary search documents, **Ex. 16** of which the Court may take judicial notice, FRE 201.

### F.  Assignment to Segregation and Any Limitation on Recreation, Phone Use, and Commissary Purchases Did Not Violate Plaintiff's Constitutional Rights.

Plaintiff's complaints about his segregation assignments fail to state or sustain a claim. He complains that he was placed on disciplinary segregation after the dayroom altercation. ECF 4, pp. 1, 2. He was not. Rather, on receiving the infraction, he was assigned to AdSeg PA[4] and later approved for AdSeg (to be kept away from Bloods). **Gragg Ex. 1** ¶¶ 9-11; **ECI Ex. 2** p. 3. His complaints about segregation housing conditions, even if accurate, do not rise to the level of a violation of his constitutional rights. The Court should dispose of his claim in Defendants' favor.

---

[4] To the extent that Plaintiff complains about the infraction, Plaintiff has no constitutionally protected right from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest, or the consequences therefrom. *See Freeman v. Rideout*, 808 F.2d 949, 951 (2nd Cir. 1986); *see also*, *Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980).

"The Eighth Amendment is not a basis of broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. Rather, the Eighth Amendment proscribes the 'unnecessary and wanton infliction of pain.' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citations omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). Conditions that are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. *See, e.g.*, *Mickle*, 174 F.3d at 471-72 (administrative segregation with 23-hour lockup, no radio or TV, five hours of exercise a week, and exclusion from all programs did not violate the Eighth Amendment because it did not deny a "basic human need").

To make out a claim that prison conditions amount to cruel and unusual punishment, an inmate must have suffered actual, serious harm from the challenged conditions. As the Fourth Circuit recently recognized, under the PLRA, 42 U.S.C. § 1997e(e), an inmate cannot sue for damages for emotional or mental injury absent evidence of physical injury caused by the alleged conditions. *Martin v. Duffy*, 977 F.3d 294, 301 (4th Cir. 2020). *See also*, *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (double bunking, lack of exercise and inadequate ventilation, without evidence of actual harm, not cruel and unusual punishment); *Richmond v. Stigile*, 22 F. Supp. 2d 476, 480 (D. Md. 1998) (deprivation of hygiene items not constitutional violation in absence of harm); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (no entitlement to presumption of actual harm). Here, Plaintiff alleges no physical injury from his segregation housing or related restrictions.

Isolation, inactivity, discomfort, and inconvenience do not in and of themselves violate the Constitution. *Mickle*, 174 F.3d at 471-72 (indefinite administrative segregation); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (filthy, vermin-infested, and flooded conditions, with unbearably hot cells,

cold food, and smaller portions, no clean clothing or bedding, *no outdoor recreation*, etc., for six months were not atypical and significant); *Sweet v. S. Carolina Dep't of Corr.*, 529 F.2d 854, 861 (4th Cir. 1975) (*prolonged segregation*). *See also Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (loss of out-of-cell exercise privileges for one year).

The Eighth Amendment does not prohibit cruel and unusual *conditions*, it prohibits cruel and unusual *punishments*. In addition to the objective element discussed above, a claim of unconstitutional conditions of confinement also requires "a prisoner to prove…'*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka*, 71 F.3d at 166 (emphasis in original; citation omitted). To have a sufficiently culpable state of mind, the defendants must have acted with deliberate indifference to the allegedly unconstitutional conditions. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Mickle,* 174 F.3d at 472; *Strickler, v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). A finding of deliberate indifference requires that the defendant both "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837. Moreover, the conditions must be so severe that the defendants could be charged with "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir. 2006).

It is standard procedure that every inmate involved in a fight receives an infraction and is assigned to AdSeg PA. *See* **Perry Ex 6** ¶¶ 11, 12. (Perry reasonably issued the NOIRV for the altercation. She did not have control over his housing. *Id*.)

The October 25, decision by the intelligence department after a segregation review and consult with Plaintiff, to place Plaintiff on AdSeg with a direction to keep him away from the Bloods STG group until his transfer to a different institution also was reasonable and in keeping with DPSCS's goal of safety

and security for inmates and staff. *See* **Gragg Ex. 1** ¶¶ 10-12. The opposite of inhumane, this was to protect Plaintiff.

Plaintiff does not describe "inhumane," deprivations. He complains that, while in HU4, after he was classed as an AdSeg inmate, he was wrongfully denied access to the phone or to commissary items other than hygiene items. He wrongfully concluded that his privileges should have changed from the time he was first assigned to HU4 to the time he was told he was being considered as an AdSeg inmate.  The reason he apparently drew this conclusion was his mistaken believe that he initially was housed as a disciplinary segregation inmate. *See*, ECF 4, p. 1, p. 2 ¶ 4; **ARC Ex. 4**, pp. 10, 11, 15, 21. He was not:  He was housed as AdSeg PA. **Gragg Ex. 1**; **ECI Ex. 2** p. 2. Whether as AdSeg PA or AdSeg, he was a Level II inmate in HU4. **ECI Ex. 2** seg manual § O.2 ("Inmates assigned to Administrative Segregation shall be treated according to the provisions of Segregation Level II."). However, even if he were initially housed as a Level I disciplinary segregation inmate (*Id*., § O.2) and later changed to a Level II AdSeg, his restrictions and privileges would not have changed, except that a Level II inmate could have fewer postage stamps than a Level I inmate. *Id*., p. 43.

The restrictions, in place to maintain safety and order among inmates with special security needs, provided that, whether a Level I or II inmate, Plaintiff was not permitted phone privileges absent exceptional circumstances or specific approvals, **ECI Ex. 2** p. 40 § U.1; had limited commissary privileges, being permitted only to ordering from the Segregation Commissary List, *id*. p. 36 § H.1 (food not permitted, *id*. § H.3 & p. 41 § V.1.c; *see also*, p. 51.  Plaintiff's expectations for better treatment were not reasonable, were counter to ECI policy, and certainly do not present inhumane conditions under applicable law.

Nor do Plaintiff's complaints about rec time amount to inhumane treatment. He complained in only one ARP of one occasion of denial of rec time, July 14, 2020. **ARC Ex. 4**, p. 28. Denial of one day's

recreation on July 14, 2020, does not rise to the level of a constitutional violation. [5]

As for Plaintiff's complaint that he was denied outside recreation, ECF 1, p. 5, ECF 4, p. 5, it is not actionable as it did not deny basic human needs, *see, e.g.*, *Beverati*, *supra*, 120 F.3d at 504. Moreover, courtyard privileges were for Level III inmates, not the more restricted Level I or II inmates. **ECI Ex. 2** p. 47, DD p. 18. Even when he was not in HU4, outside recreation was not guaranteed, and is contingent on a number of conditions. *Id.*; **Gragg Ex. 1 ¶** 14. Even if Plaintiff were denied outside rec, it is not a sustainable claim because, as with his ARPs about commissary and phone access, he failed to exhaust the claim.

### G. Jobs and Programs

As for Plaintiff's statement that he could not get a job while in segregation, ECF 1, p. 5, there is no constitutional right to participate in any in-prison program, including jobs. *See, e.g., Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Paoli v. Lally*, 812 F.2d 1489 (4th Cir. 1987); *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978) (work assignments are at prison officials' discretion); *Hoptowit*, 682 F.2d at 1254-55 (no right to job); *Garrett v. Angelone*, 940 F. Supp. 933, 942 (W.D. Va. 1996) *aff'd*, 107 F.3d 865 (4th Cir. 1997) (no constitutional right to job in prison); *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (loss of job upon segregation not atypical and significant hardship).

---

[5] Moreover, Plaintiff's Records of Segregation Confinement (ROSC) show that he took recreation on many occasions, and, at least on the following days:

Leading up to his August 2020 supplemental complaint, *while on HU4*, the ROSCs show that he was provided with recreation on October 28 and 31 (no data was input for the days leading up to Oct 28), and on November 4, 8, 13, 15, 18, 20; but he refused rec on November 5, 7, 9, and 12. **ECI Ex. 2** pp. 85-90. When he again was on HU4, he took rec Feb 21, 22, 25, 26, 27 and Mar. 3, 4, 5, 6, 7, 10, and 12. **Id.** pp. 99-102.

Leading up to his August 2020 supplemental complaint *while on HU5*, Plaintiff took rec time on: Dec. 2, 13, 17 18, 19, 23; Jan. 3, 6, 7, 8, 13, 14, 15, 16, 17, 31; Feb 5, 6, 7, 10, 12; Mar. 13, 24, 27; April 7, 8. 10 13, 14, 17, 30; May 1, 12, 18, 20, 22; (no information was recorded for June), July 20, 21, 22, 23, 24, 27, 31. **Id.** pp. 91-98, 103 – 112.

It appears that notations were not recorded for Plaintiff's activities on each and every day; so, the days of recreation do not necessarily reflect all the occasions on which Plaintiff took recreation.

**H. Plaintiff Failed to State a Claim for Interference with His Religion.**

Plaintiff sues Lt. Donaway for an alleged denial of access to weekly religious programming while he was housed on AdSeg in HU5, ECF 4, p. 3 ¶ 6. Plaintiff was afforded access to weekly programming and otherwise was able to worship on his own in his cell, factors that prevent a finding of substantial burden, let alone a burden that would outweigh the compelling safety and security interests in protecting plaintiff as an AdSeg inmate from Bloods, and in mitigating against the spread of the coronavirus. Not only because these were not the Lt. Donaway's decisions (**Chaplain Ex. 10** ¶ 4; **Gragg Ex. 1** ¶¶ 10-11), and regardless of whose decisions they were, the Court should dispose of Plaintiff's claim in Defendant's favor.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA" or the "Act") is the current federal statutory law on prisoners' religious rights. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2774 (2014). It provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates" that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc. RLUIPA does not afford prisoners the unfettered right to religious exercise. *Rodgers v. Shearidin*, No. CIV.A. CCB-09-1962, 2011 WL 4459092, at *24 (D. Md. Sept. 22, 2011).

To state a claim under either RLUIPA or the First Amendment, the inmate plaintiff must establish that defendants' conduct *intentionally interfered* with his religious exercise: RLUIPA and the First Amendment are not intended to remedy negligent constraints on inmates' religious practices. *Lovelace v. Lee*, 472 F.3d 174, 194 (4th Cir. 2006). Where a plaintiff cannot sustain a RLUIPA claim, there is no need for a First Amendment analysis because the claim will fail there also. *See, e.g., Tillman v. Allen*, 187 F.Supp.3d 664, 675 (E.D.Va. 2016); *Lovelace*, 472 F.3d at 198 n. 8; *Rodgers v. Jackson*, 2017 WL 4246866, at * 9. Plaintiff makes no showing of substantial burden or intentional interference; in fact, there

was none.

    *a.   Plaintiff Has Not Alleged and Cannot Establish a Substantial Burden on Religious Exercise.*

Plaintiff first must establish a *prima facie* case for a substantial burden on religious exercise. *see Lovelace*, 472 F.3d at 189; *Rogers* 2017 WL 4246866, at *22-23. The Fourth Circuit has defined "substantial burden" as an imposition "that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, ... or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." *Lovelace*, 472 F.3d at 187 (quotations, citation, and alterations omitted). The Fourth Circuit clarified this as placing a person "between a rock and a hard place." *Incumma v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015).

An interference is not a substantial burden to a practice that is recommended or preferred but not mandated, particularly where, as here, alternative means of religious exercise are available. *See, e.g., Krieger v. Brown*, 496 Fed.Appx. 322, 325-6 (4th Cir. 2012) (no substantial burden where the denied practice was a preferred, or, "best" practice, not a mandatory one); *Tillman,* 187 F.Supp.3d at 674. RLUIPA is not intended to address all constraints, lest it render meaningless the concept of "substantial." *See, Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).

 Congregate services are a preferred, not mandatory, form of religious exercise; thus, interference will not impose a substantial burden. *See, e.g.*, *Cooper,* 855 F.2d at 129-30.

> In this regard it must be recognized that while Muslims place great importance on group prayer, individual prayer is acceptable and a Muslim will receive blessings from individual prayer. The validity of individual prayer in prison situations is demonstrated by the uncontradicted testimony of a qualified Imam that a person incarcerated by reason of his own acts is required to follow the restrictions attributable to his status. Here the restrictions included limitations on group prayer.

*Id.* This concept is reflected in ECI's Inmate Handbook, notifying inmates that congregate services are a privilege, not a right, with their availability subject to prevailing security concerns. **ECI Ex.  2** p. 59.

Indeed, Plaintiff, under Sunni mandate was to avoid congregation to avoid contagion. **Chaplain Ex. 10** ¶ 5. Moreover, Plaintiff does not aver that he was denied individual prayer. In fact, he was able to pray in his cell and to access weekly religious programming. *Id*. ¶ 4. He was permitted to have a religious book in his cell while on segregation. **ECI Ex. 2** p. 43. Nor was the use of a prayer rug a mandatory practice, **Chaplain Ex. 10** ¶ 6; thus, Plaintiff's missing prayer rug did not violate his religious rights. Moreover, by the time he left ECI AdSeg, Plaintiff did have a prayer rug which travelled with him to his next institution. **DRCF Ex. 12** p. 2.

RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722; *see also*, *McRae v. Johnson*, 261 F. App'x 554, 558 (4th Cir. 2008); *Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012); *Rodgers*, 2011 WL 4459092, at *23; *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007). Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and should exercise judicial restraint in cases concerning prison administration. *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)) (internal citation and quotation marks omitted); *Cutter*, 544 U.S. at 723; *Lovelace*, 472 F.3d at 189-90; *Rodgers*, 2011 WL 4459092, at *24; *Couch,* 679 F.3d at 202.

Even if Plaintiff could establish that his right to religious exercise was substantially burdened, there still is no violation of RLUIPA (or, therefore, of the First Amendment): There was a compelling government security interest to protect Plaintiff from the risks of exposure to Bloods in general population at ECI, and, during the COVID-19 emergency, to protect inmates and staff from exposure to the coronavirus. Still, Plaintiff was afforded access to weekly programming and otherwise was able to worship on his own in his cell, factors that prevent a finding of substantial burden. The Court should dispose of his claim in Defendants' favor.

**I. Plaintiff Failed to State a Claim for Denial of Access to the Courts.**

Plaintiff sues Lt. Donaway for an alleged denial of access to the library while he was housed on AdSeg in HU5, ECF 4, p. 3 ¶ 6. He does not express a direct intent to assert that this constituted a denial of access to Court, but, to the extent that the Court construes it as such, the Court should dismiss the complaint, or, in the alternative, grant summary judgment for Lt. Donaway (and, to the extent Plaintiff's complaint may be –though it should not be--construed extremely broadly to include them, any other Defendants).

Prisoners maintain a constitutional right of meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821-22 (1977). An inmate's federally protected right of access to court is very limited. It is simply the right to present certain types of meritorious grievances to the courts. *Plyler v. Moore*, 100 F.3d 365, 373 (4th Cir. 1996). It is not the right to have all the tools the inmate may consider necessary to litigate that grievance effectively, nor is it an abstract right of access to legal materials in and of themselves. *Lewis v. Casey*, 518 U.S. 343, 354 (1996) (vacating system-wide injunction relating to provision of legal materials and services in absence of actual deprivation of access except in isolated cases). The right of access extends only to an inmate's challenges to his conviction or to civil rights actions brought to enforce basic constitutional rights. *Lewis*, 518 U.S. at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*.

To make out a valid federal constitutional claim of denial of access to court, the inmate must allege and prove more than denial of access to particular legal materials. He must show that he has suffered actual prejudice to his ability to proceed with a particular protected legal claim. *See Strickler v. Waters*, 989 F.2d 1375, 1383 (4th Cir. 1993); *Bernadou v. Purnell*, 836 F. Supp. 319, 325 (D. Md. 1993) *aff'd sub nom. Bernadou v. Rollins*, 8 F.3d 816 (4th Cir. 1993). Actual prejudice in this context refers to concrete harms such as the inability to meet a filing deadline or that the inmate was "so stymied by inadequacies

of the law library that he was unable even to file a complaint." *See, e.g., Lewis,* 518 U.S. at 349, 351; see also *Taylor v. NYC*, No. 20-CV-5036 (MKV), 2021 WL 456145, at *2 (S.D.N.Y. Feb. 8, 2021) (applying the principle in the context of COVID-19 restrictions). Plaintiff also must "affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (quoted in *Anderson v. Quality Corr. Health Care*, No. 919CV02086HMHMHC, 2021 WL 276059, at *6–7 (D.S.C. Jan. 5, 2021), *report and recommendation adopted*, No. CV 9:19-2086-HMH-MHC, 2021 WL 271841 (D.S.C. Jan. 27, 2021).

Plaintiff alleges no specific requests that were denied, alleges no consequent harm. Nor does he aver that, or how, Lt. Donaway directly interfered with any such access; therefore, the Court should dismiss his complaint.

### J.  Allegations Related to Personal Property Do Not State a Constitutional Claim.

In his filings, Plaintiff states that his property was damaged or missing. *See, e.g.*, ECF 1, p. 4. If the Court is inclined to infer that Plaintiff intended to raise a § 1983 claim for the deprivation of property, the Court should dismiss it. Claims of a prison official's negligent deprivation of property do not state a due process violation. *Daniels v. Williams*, 474 U.S. 327, 332, 335-336 (1986). Because Maryland law provides an adequate post-deprivation remedy, *see Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982), any claims of a prison official's intentional deprivation of property do not implicate a due process violation. *Hudson v. Palmer*, 486 U.S. 517, 533 (1984). Plaintiff's failure to exhaust his available administrative remedies is further cause to dismiss any property deprivation claim he may have intended.

### K. Visitation

Plaintiff complains that on October 18, 2019, he was denied visitation with his parents. COII Parker was assigned to work visitation at ECI on October 18, 2019, but worked ECI-East, not ECI-West, where Plaintiff's parents presented for visitation and had no involvement in denying entry of Plaintiff's parents.

*See* **Parker Ex. 17**; **ECI Ex. 2** p. 113. Regardless, there is no due process violation in denial of visitation: visitation is a privilege, not a right. *See White v. Keller*, 438 F. Supp. 110, 115 (D. Md. 1977) *aff'd,* 588 F.2d 913 (4th Cir. 1978); *see also*, *Overton v. Bazzetta*, 539 U.S. 126, 132, 136 (2003) (legitimate security interest in limiting visitation; denial of visitation does not deprive inmates of basic human rights, or present inhumane conditions). In any event, the institution turned Plaintiff's parents away because of security concerns. **ECI Ex. 2** pp. 114-115.

**L. Plaintiff's Increase from Minimum to Medium Security Classification and "Delay" in Reducing His Classification to Pre-Release Did Not Implicate a Protected Liberty Interest Because the Institution Was Rationally Pursuing a Legitimate Penological Interest**

Plaintiff complains that his security level increase from minimum to medium security "without probable cause" and put him in "this situation" ECF 1, p. 6. This does not state an actionable claim. Nor does any complaint about a "delay" in classing him as a pre-release inmate.

A classification decision or a transfer from one prison facility to another does not ordinarily implicate a protected liberty interest or state a claim under § 1983. *Meachum v. Fano*, 427 U.S. 215 (1976); *Paoli v. Lally*, 812 F.2d 1489, 1492-93 (4th Cir. 1987). A prisoner has no liberty interest in being housed in any particular facility or on a particular status. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983). *Wetzel v. Edwards,* 635 F.2d 283 (4th Cir. 1980), is illustrative of the federal court's view of prison management, especially regarding the security classification of prisoners. In *Wetzel*, the Fourth Circuit reversed the district court's grant of a preliminary injunction ordering the transfer of an inmate to a medium security prison against the State's decision that the inmate warranted housing in a maximum-security facility. The Fourth Circuit stated:

> Thus, the prison administrators denied Wetzel's transfer based on their informed discretion as penal administrators. The realities of running a penal institution are complex and unique to the prison environment. Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their informed discretion have been accorded "wide-ranging deference" by the federal courts. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 (1977).

30

> Moreover, as long as prison authorities are rationally pursuing a legitimate penological objective, the administrator has the "last word." *Pittman v. Hutto*, 594 F.2d 407, 412 (4th Cir. 1979). Judicial recognition that courts are ill-equipped to deal with problems of prison administrators " . . . reflects no more than a healthy sense of realism." *Procunier v. Martinez*, 416 U.S. 396, 405 (1974).

*Wetzel*, 635 F.2d at 288. Moreover, it is beyond cavil that inmates are not entitled as a matter of constitutional law to be housed at any particular security classification or prison. *Slezak v. Evatt*, 21 F.3d 590 (4th Cir. 1994).

Here, Plaintiff's belligerence and threats to correctional staff because he was told he was then a minimum security, not a pre-release level inmate, resulted in a formal infraction and elevation of his security level. *See*, **Gragg Ex. 1 ¶¶** 5-7; **ECI Ex. 2** pp. 5-17. After passing some time without an infraction, in May 2020, his security level was reduced to pre-release status, and he was transferred to a minimum-security facility when a bed became available, and the COVID-19 situation allowed for transfers. **Gragg Ex. 1 ¶** 14.

### M. There is No *Respondeat Superior* Liability in this Case.

There is no *respondeat superior* liability under §1983. *Monell v. New York Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Supervisory correctional officials can be held liable only for their own personal wrongdoing or for supervisory actions that directly violate constitutional norms; there must be personal involvement by the defendants. *Shaw v. Stroud,* 13 F.3d 791 (4th Cir.), cert. denied, 513 U.S. 813 (1994)*; see also, Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1977). To establish supervisory liability in a §1983 action in general, the Fourth Circuit has held that Plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799. *See, e.g., Grayson v. Peed*, 195 F.3d 692, 696 (4ᵗʰ Cir. 1999) (no supervisory liability without direct knowledge and active decision-making)*; see also* CB-17-1539, ECF 49, pp. 26-27.

Plaintiff fails to state a claim for *respondeat superior* liability of any of the Defendants. He offers no allegations that any supervisory defendants were personally involved in responding to the dayroom fight, directing where Plaintiff was housed or whether he should be assigned to segregation, supervising ARP processing, providing him access to religious programming or library materials, or handling his personal property.

Plaintiff's stated intent as to his complaints about his medical care are directed at the independent medical contractor, *see* ECF 4 p. 2 ¶ 3. In any event, supervisory prison officials cannot be held liable for actions or failures to act on the part of the medical staff. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4ᵗʰ Cir. 1977); *see also Carter v. Morris*, 164 F.3d 215, 220-21 (4ᵗʰ Cir. 1999); *West v. Atkins*, 815 F.2d 993, 996 (4ᵗʰ Cir. 1987), *rev'd on other grounds*, 487 U.S. 42 (1988). Supervisory officials can only be liable where it is shown they either failed to timely provide needed care, deliberately interfered with doctors' performance or tacitly authorized or were deliberately indifferent to prison physicians' constitutional violations. *Miltier v. Beorn*, 896 F.2d 848, 854-55 (4ᵗʰ Cir. 1990); *Rogers v. Evans*, 792 F.2d 1052, 1059 (11ᵗʰ Cir. 1986). There is no such allegation, let alone showing, in this case. Plaintiff specifically states his intent is to name as defendants "medical staff" and the "entire [sic] medical field that's contracted by D.O.C. to work at the Eastern Correctional Institution (E.C.I.) During the time of Oct. 13, 2019, to the current day." ECF 4, p. 2 ¶ 3 (filed August 18, 2020). Moreover, ECI staff does not have control over the medical providers' scheduling of examinations, or the issuance, orders, or prescriptions for medical care. *See*, **Declaration of Warden West, Ex. 18.** Thus, the Court should dispose of any supervisory claims in Defendants' favor.

**N.  Qualified Immunity Precludes Liability**

By design, qualified immunity is meant to protect Defendants not simply from liability but also from

the vexations of litigation, including discovery. *See*, *Crawford-el v. Britton*, 118 S.Ct. 1584 (1998); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, the Court must determine Defendants' entitlement to qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A qualified immunity analysis generally turns to the "objective reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell v. Forsyth, supra*. Qualified immunity "is intended to allow public officials to act, with independence and without fear of consequences, where their actions do not implicate clearly established rights." *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). It "protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines,'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992), protecting them for mistakes of law, of fact, or both, *see Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting); *Peterson v. Davis*, 551 F.Supp. 137 (1982), *aff'd*, 729 F.2d 1453 (1984) (application to correctional officers).

Qualified immunity protects these Defendants because the evidence establishes that they did not violate any clearly established constitutional right of which a reasonable public official should have known. *See, Harlow v. Fitzgerald*, *supra*; *Anderson v. Creighton*, 483 U.S. 635 (1987); *Turner v. Dammon, supra*; *Taratino v. Baker*, 825 F.2d 772 (4th Cir. 1987); *Wilson v. Layne*, 526 U.S. 603 (1999). No clearly established law having been violated, the prison officials were entitled to qualified immunity.

*Winfield v. Bass*, 106 F.3d 525, 532-33 (4th Cir. 1997).

Defendants did not conduct themselves in any way that would have caused them to believe they clearly were violating Plaintiff's constitutional rights, because, of course, they were not. The response to the spontaneous dayroom fight was immediate and reasonable. Plaintiff's assignments to segregated housing were reasonable, based on legitimate penological interest in safety and security, including Plaintiff's own safety; further, the restrictions on segregation and a one-day denial of recreation did not deprive him of basic human needs, substantially burden his religious beliefs, or deny him access to the courts. His ARPs were processed in accordance with regulations. The denial of Plaintiff's parents' entry for visitation also was to promote the safety and security of those in the institution. There was no conduct by Defendants that approached, let alone, passed the threshold for believing, or finding, a violation of Plaintiff's constitutional rights.

Therefore, the Court should dispose of Plaintiff's complaint in Defendants' favor.

## IV.    <u>CONCLUSION</u>

The Court should dismiss Plaintiff's complaint, or, in the alternative, grant summary judgment in Defendants' favor.

Respectfully submitted,

_____/s/_____
TERESA M. KELLY
Assistant Attorney General
Federal Bar No. 09034

St. Paul Plaza - 19th Floor
200 St. Paul Place
Baltimore, Maryland  21202
(410) 576-7962 (Telephone)
(410) 576-6880 (Telefax)
E-mail: tkelly@oag.state.md.us

Attorneys for Defendants